# HENRY HAMMOND'S Lessee, *vs.* WILLIAM INLOES and others.

Though cases may occur in which this court will be constrained to withhold its assent to, and review, its previous adjudications, yet it has been the almost uninterrupted practice of all courts to receive their own decisions as of binding force.

The solemn adjudications of an appellate court of last resort, ought, on general principles of judicial propriety, to be approached with caution, and should never be disturbed, except to settle some great rule of property the public interest requires to be reviewed.

On a second trial in ejectment between the same parties and those claiming under them, on the same subject matter, the previous decisions ought to be considered conclusive, unless glaring injustice has been done or some egregious blunder committed.

But to give the binding decision these conclusive qualities, it ought to be explicitly declared and perfectly understood, and, to become the law of the case, it ought definitely to settle the rights of the litigant parties.

If an exposition is given to a will or deed, or act of Assembly, fully defining the rights of the parties, or any other opinion expressed settling the title to the thing in dispute, it should be deemed irrevocable, whenever the same persons and those claiming under them are concerned in the contestation.

If on a second appeal it appears that the court below has ruled in conformity with the principles settled by the previous decision, their judgment must be affirmed; in such case no error can be imputed to the inferior court.

This court recognises the decision in the cases of *Wilson vs. Inloes*, 6 *Gill*, 121, and *Casey vs. Inloes*, 1 *Gill*, 430, as binding and authoritative decisions in this case, unless the record presents a materially different case.

Though a *procedendo* will not be granted when this court can see that the plaintiff must fail in his action, it does not follow that the granting of such a writ implies that he must ultimately succeed.

The passage in the opinion of the court in 1 *Gill*, 510, relative to the plaintiff's fifteenth prayer, must be considered in reference to what the court said in connection with the subject matter of that prayer, which was exclusively the right of the parties to improve in front of their lots under the act of 1745, ch. 9.

Abandonment of all questions as to the *location* of title papers, cannot alter their construction or effect upon each other.

The object of the act of 1745, ch. 9, was to authorise the owners of water lots to acquire a right to vacant land covered by water without applying to the land office in the usual way; it was a legislative grant, in consideration of certain improvements materially beneficial to the public.

But these improvements could be made only on vacant property of the State, such as she could rightfully grant.

The act of 1773, ch. 4, made an addition to Baltimore town, and extended the privileges granted by the act of 1745, ch. 9, to the owners of water lots in such addition. The land in dispute consisted of improvements made out of the water under these acts. The plaintiff claimed under a patent granted in 1663, of a water lot, part of this addition. The land on which these improvements were made, being then covered by water and in front of and adjoining this lot, was granted by patent to another party in 1695, which patent was set up by the defendant as an outstanding title. HELD:

That the plaintiff could not recover, without showing that the land granted by the patent of 1695 had escheated, or the title of the patentee thereto had become extinct prior to the passage of the act of 1773.

Where an act of Assembly professes in terms to grant a particular parcel of land, it may be presumed that the State had title to the land when the act passed.

But there is a plain distinction between such an act or a patent specifying the thing granted, and an act which grants a right generally and operates merely in favor of those who may subsequently show themselves entitled to the benefit of its provisions.

An escheat patent is *prima facie* evidence that the land was liable to escheat at the date of the warrant, and an act of Assembly reciting that the property had escheated and making a grant would have the same effect.

If the junior grant recites an escheat, the elder patent must give place to it, unless it be shown that the land had not escheated; the *onus* of proof in such case is shifted.

The passage of the act of 1773, ch. 4, will not warrant the presumption of law that the patentee of the patent of 1695 had, before its passage, died intestate and without heirs.

It is a general presumption, that things once proved to have existed in a particular state, continue in that state until the contrary be established by evidence, either direct or presumptive.

The act of 1773, ch. 4, operating as a grant of the public domain, and affecting the rights of navigation and fishery, by allowing improvements to be made into navigable water, is to be judicially noticed by the courts as a public law.

A plaintiff in ejectment must always in the first instance make out a legal and possessary title to the premises, and the defendant's evidence may be confined to falsifying his adversary's proof, or rebutting the presumptions arising therefrom.

The defendant need not offer any evidence of title in himself, or of title in a third person; it is sufficient if he makes it appear to the jury that a legal and possessary title does not subsist in the plaintiff.

It is clear that the plaintiff must be defeated, if it appears that the party under whom he claims had no title, no matter in whom the right may really be, but if he shows a *prima facie* case, the burden is thrown upon the defendant.

The patentee of land covered by navigable water, can only claim in subordination to the rights of the public of fishery and navigation: such land does not admit of possession and acts of ownership in the ordinary way.

A prayer that defendants have shown no title to the property embraced within the plaintiff's pretensions on the plot, "including the square from ―― street to the water," is defective, because it does not specify the property to which it was intended to apply, neither the square nor the water being mentioned.

A prayer that if the jury "find the act of 1816, ch. —," is defective in not specifying the *particular* act of that session; and as no act of 1816 had been given in evidence, it was properly rejected for this reason also.

A prayer that by operation of the act of 1773, the right of improvement was vested in those under whom the plaintiff claims, and that the patent of "*Bold Venture*" does not defeat this right, "provided the jury believe that O., the patentee, died intestate and without issue before that year," is erroneous, because it assumes the escheat of "*Bold Venture*" upon the death of O. without *issue*.

The law does not presume that a person who is proved to be dead left no

Hammond's Lessee, *vs.* Inloes, *et al.*

heirs; where the death only is proved, there must be some negative proof as to the existence of issue.

The death of a person may be presumed after a long lapse of time, as where, if alive, he would have been one hundred and fifty years old; when persons are known to have lived ninety and one hundred years, the court cannot say that others have died at an earlier age without some evidence on the subject.

APPEAL from Baltimore county court.

This was an action of *ejectment*, and the present appeal arises from a second trial of the case of *Casey vs. Inloes*, after it was remanded under the decision on the first appeal in 1 *Gill*, 430. After remanding and before the trial, there was a suggestion of the death of Mrs. Casey, the lessor of the plaintiff, and an appearance entered for Henry Hammond, as her *heir at law*.

*Exception.* At the trial the plaintiff offered in evidence the patent for "*Mountenay's Neck*," dated 30th of June 1663, and all the deeds, (except the deed of Wheeler to Jones,) which were given in evidence at the former trial, and all the other testimony offered at said trial except the testimony relating to the escheat of "*Bold Venture*," and to the death of Oulton, the patentee thereof, and to the boundaries of said tract, and also excepting the patent of "*Roger's Inspection*," and all papers relating thereto. (This testimony, together with a plat of the property in dispute, is set out *in full* in 1 *Gill*, 435 to 487, and therefore need not be repeated here;) and then further offered the following acts of Assembly and ordinances, viz: 11th March 1823; 1745, ch. 9; 1773, ch. 4; 1783, ch. 24; 1796, ch. 68; 1729, ch. 12; 1732, ch. 14; which it was agreed might be read from the printed publications thereof. And further offered, proving the same by the surveyor, the plat of the addition to Baltimore town, made and laid out conformably to said act of 1773, ch. 4. And proved that part of "*Mountenay's Neck*," as shown on the plat, was within the said addition, but that old Baltimore town only came to the west side of Jones' Falls, and did not include "*Mountenay's Neck*," or any part of it. And further

gave evidence, that since the former trial the plaintiff's lessor, Elizabeth Casey, has died, and left as her only issue two children, Henry Hammond and Jane Pinkney, wife of William Pinkney.

The defendants read in evidence all the patents and deeds, including the patent of *"Bold Venture,"* granted to John Oulton, on the 20th of March 1695, and the will offered at the former trial, and gave the same evidence as to their locations.

The plaintiff prayed the court to instruct the jury as follows:

1st. (The first part of this prayer, as to the presumption of a deed from Alexander Mountenay to Robert Blunt, or his ancestor, is identical with that in 1 *Gill,* 474, 475, making the necessary change, so as to leave to the jury the finding of the death of Mrs. Casey since the suit was brought, leaving two children, a daughter and her son, Henry Hammond, her only issue, being her children by her husband, John Hammond.) And if they further find that the acts of Assembly read in evidence are passed, and that by virtue and in pursuance of the act of 1773, ch. 4, *"Mountenay's Neck"* was surveyed and added to Baltimore town; and also find the filling up, as stated in the testimony, so that the ground claimed in this case was, at the bringing of this suit, fast land, and. that the defendants were then in possession thereof; and the water boundaries to be truly located, as laid down on the plats, at the several periods assigned to the several locations thereof, then the plaintiff is entitled to recover.

2nd. If they believe from the evidence that John Oulton died at any time before the institution of the *writ* in this cause, then the defendants have shown no such subsisting outstanding title, in any one representing him, to *"Bold Venture,"* as can *bar* the plaintiff's recovery in this case.

3rd. That the defendants, if the jury find the facts set forth in the plaintiff's first prayer, and even if they believe the evidence offered by the defendants, are mere trespassers and intruders on the land claimed by them in this cause, and as

such cannot set up an outstanding title in any third person to defeat the plaintiff or to protect their intrusion.

4th. If they find the patent of *"Bold Venture"* of 1695, granted to John Oulton by the State, yet as the defendants have offered no evidence of any entry upon, or possession of any part of the said tract of land by, John Oulton, or any one claiming title through or under him, from the date of said patent down to the present time, then the mere original existence of such a patent, in the absence of any proof of the facts aforesaid, does not constitute such a present, subsisting, available, outstanding title in any third person, as will bar the right of the plaintiff to recover upon the facts set forth in his first prayer, provided the jury believe them; and provided also, the jury find from the evidence that said Oulton departed this life at any time before twenty years next preceding the impetration of the *writ* in this cause.

5th. That defendants have shown no title whatever to any part of the property embraced within the plaintiff's pretensions, as delineated on the plat, including the square from —————— street to the water.

6th. That they are, therefore, mere intruders, and cannot protect their possessions by setting up an outstanding title in any stranger with which they have not connected themselves, and have no privity.

7th. If the jury find the act of 1816, ch. ——, and that *"Mountenay's Neck"* and the property in dispute are embraced within the local limits described therein; and further find the patent aforesaid to John Oulton; and that from the date of said patent in 1695 until the present time, there is an absence of all proof that either John Oulton himself, or any one claiming by, through or under him, did ever enter upon or become possessed of any part of the tract of land granted by said patent, then they may and are bound to presume, in the absence of any evidence to the contrary, that the State became reinvested with the title to *"Bold Venture"* when the said act of 1816 was passed, and that according to the true construction of said law, the plaintiff, or those under whom

he claims, had a right to fill up and extend his lot in the water opposite to and in front of the same, so as to reach the *Port Wardens'* line.

8th. That before the plaintiff be barred from recovery by reason of the patent of *"Bold Venture,"* the defendants must show such outstanding title in some third person to said tract, as would enable him to recover in ejectment against both the contending parties in this case.

9th. If the jury believe from the evidence that *"Mountenay's Neck"* was added to and made part of Baltimore town in the year 1773, then, by operation of the act of Assembly of said year, the right to improve in front of the lot of the plaintiff, as delineated on the plat, was, for the first time, vested in those under whom the plaintiff claims, and that the operation of the patent of *"Bold Venture,"* does not defeat the grant of said right in that year, or prevent its passing by that act, provided the jury believe that Oulton, the patentee, died intestate and without issue before that year.

10th. That the passage of the said act of 1773, is itself evidence, connected with the circumstances of the grant to Oulton in 1695, and of the age, which the jury are at liberty to infer he must have been at that time, to have made a contract with the State, and the period since elapsed to the passage of said act, and the non-adduction of any will, or any evidence of any claim made by any person representing said Oulton, from 1695 to this day; from all of which the jury may find, that John Oulton died intestate and without heirs before the year 1773.

The defendants prayed the court to instruct the jury as follows:

1st. That the location of *"Mountenay's Neck"* on the plats in the case not having been counterlocated, the jury must find such location of that tract to be the correct one.

2nd. If the jury find that *"Bold Venture"* was granted, as given in evidence by the defendants, and that defendants' location of the second and third lines of that tract on the plats is the correct location, then the patent of *"Mountenay's Neck"*

gives no title to the lessor of the plaintiff to the lot of ground for which the defendants have taken issue on the plats.

3rd. That the second and third lines of "*Bold Venture*," if the jury find said tract was granted as given in evidence by the defendants, must run with two lines of "*Mountenay's Neck*," as that latter tract is located on the plats; and if the jury find that the said two lines are those on the plats, running from black (M) to black (N,) and from black (N) to red figures (320,) then the patent of "*Mountenay's Neck*" gives no title to the lessor of the plaintiff to the lot of ground for which the defendants have taken defence on the plats.

The court, (LE GRAND, A. J.,) granted all the prayers of the defendants, and rejected all those of the plaintiff. To this rejection, and the granting of defendants' prayers, the plaintiff excepted, and the verdict and judgment being against him, he appealed.

The cause was argued before ECCLESTON, MASON and TUCK, J.

*Charles F. Mayer* for the appellant.

There are additional facts in this case which ought to modify the decision of the court on the former appeal. The plaintiff claims title under the patent granted in 1663. It is conceded that the defendants have no title in themselves, they only set up an outstanding title in the patent of "*Bold Venture*," granted in 1695, *thirty-two* years afterwards. The evidence in the other cases was also all here, except that relating to the escheat of "*Bold Venture*" and the death of Oulton, and the patent and papers relating to "*Rogers' Inspection.*" The act of 1773, ch. 4, the addition to Baltimore town, the explanations by Bouldin of the *plat*, and the death and issue of Mrs. Casey, are additional evidence which has not been in the case before.

There is no question of location, and it is conceded that the plaintiff had his land bounding on the water, and was entitled to all the rights of a riparian proprietor. The act of

19    v.4

1773 was an act asserting the right of the State to the land under the water, embraced in the grant of *"Bold Venture."* This act was not before the court upon the former appeal, and as to its effect upon the patent of *"Bold Venture,"* the court in that case have not committed themselves. We concede that a riparian proprietor has no right at common law to build out into the water by virtue of his riparian possession. But the State may grant the power of filling up navigable water for the purposes of commerce or navigation, and may grant this privilege to the riparian proprietors, and the land thus made is attached to the fast land, as much as if made by alluvion. 5 *H. & J.*, 195, *Brown vs. Kennedy.*

Land covered by water may be granted subject to the rights of fishery and navigation, and to the sovereign power of the State over commerce and navigation. In pursuance of this power the State passed the act of 1745, ch. 9. After this there were various acts by which the exercise of this right was regulated. The act of 1773, ch. 4, embraces the land in controversy. See also 1816, ch. 29. Presumptions in favor of these acts are strong, that what the State granted it had the power to grant. These acts give to the pretensions of the plaintiff additional merit, and they have never been before the court in this *aspect.*

The decisions in the previous cases are not conclusive in this. They will be reviewed if wrong. But the point here has never yet been decided in any other case. This is put in our fourth prayer, and was put in the case of *Wilson vs. Inloes,* 6 *Gill,* 147, and the court notice it at page 161. Why did the court send the case back in 1*st Gill,* when *"Bold Venture"* was as much in then as now, unless it was in refer-ence to this very point? If the mere existence of the patent of *"Bold Venture"* was conclusive on the question, why was it not so decided there? The case of *Wilson vs. Inloes,* in 6 *Gill,* was manifestly decided upon the act of 1745 alone. If they omitted to regard the act of 1773, why should not this court now supply this omission, and in fact do justice to the

old court? The latter act was as much a grant as the act of 1745.  6 *Gill*, 161.

The grant of "*Bold Venture*" must be restricted so as not to interfere with the riparian rights of the owners of "*Mountenay's Neck.*" 6 *Gill*, 150, 17*th prayer*. The court, at page 170, answer that prayer. The State might have made the grant of "*Bold Venture*" to avail for what it was worth, and it might, under certain circumstances, be available without interfering with the rights of the riparian owners of "*Mountenay's Neck.*" At page 169, as to the question of fraud in obtaining the grant of land covered by water as if it were fast land, the decision of the court is wrong, and that decision ought now to be reviewed. The State was obviously the party on whom the fraud was perpetrated. The decision of the court in the same cause is not always conclusive. 5 *H. & J.*, 276, *Hammond vs. Ridgely*.

In 1 *Gill*, 512, the court for the first time give a *sort* of intimation as to the effect of the grant of "*Bold Venture.*" But here the case is different. The State granted the power of improvement, and thereby granted the same right as nature itself would have given by alluvion. Such was the decision in *Brown vs. Kennedy*, 5 *H. & J.*, 4 *H. & J.*, 540. 2 *Md. Ch. Decisions*, 485, *Chapman vs. Hotchkiss*. 2 *H. & McH.*, 244. We contend therefore:

1st. That by operation of the various acts of Assembly, and the ordinance of the 11th March 1823, the appellant acquired a *prima facie* valid title to all the land filled up and extended out of the water adjoining to and in front of the lot of ground, included in their pretensions. 1 *G. & J.*, 249. 11 *Pet.*, 589. 1 *Bland*, 316. 5 *G. & J.*, 367. 11 *G. & J.*, 357, 358, 360, 361. 1 *Gill*, 501. 12 *Pet.*, 454. 3 *H. & McH.*, 339.

2nd. That by the establishment of this *prima facie* title by the plaintiff, the burthen of proof was shifted to the defendants, upon whom, in order to defeat and overthrow it, it became incumbent to offer such proof of a title in themselves, in the State, or in some third person, as was originally neces-

sary on the part of the plaintiff to establish title in himself. *Chirac vs. Reinicker*, 11 *Wheat.*, 280.

3rd. That the defendants have not shown any title in the State, nor in themselves, nor such "a subsisting outstanding and available title" in any 'third person, as is sufficient to impair or defeat the *prima facie* title of the plaintiff; that the mere adduction of the patent of "*Bold Venture*" to Oulton in 1695, standing by itself, and not followed up by any other proof in connection therewith, was not sufficient to establish such a title in any third person in full life, derived from Oulton, as would have enabled such third person to recover against both or either of the parties to this case; and that in such a case the law, out of respect for the established "*prima facie*" title of the plaintiff, and in order to confirm, maintain and support it, presumes that the interest of Oulton had become extinguished or acquired by the plaintiff. 2 *Wash. C. C. Rep.*, 90.   3 *Wheat.*, 224.   2 *H. & J.*, 125.   3 *Wash. C. C. Rep.*, 498.   6 *G. & J.*, 257.   4 *Do.*, 202.

4th. That there was clear proof that no part of "*Mountenay's Neck*" was included within the limits of Baltimore town until 1773, when, under the act of that year, for the first time, part of "*Mountenay's Neck*" was added to Baltimore town, and the privileges of the act of 1745 extended over it; that there was evidence from which the jury might have found that Oulton died sometime previous to that year, intestate and without heirs, so that the title to "*Bold Venture*" became thus vested in the State, and opposed no obstacle to the extension of the right of improving into the water by operation of the act of 1745, as extended by the act of 1773, to the property now in dispute.   11 *G. & J.*, 360.   6 *Pet.*, 302.   12 *Pet.*, 454.   2 *H. & McH.*, 244.   11 *Pet.*, 589.   7 *H. & J.*, 136.   7 *G. & J.*, 27, 369.   6 *G. & J.*, 481.   3 *H. & J.*, 554.   2 *Howard*, 319.

5th. That the grant of "*Bold Venture*," up to and in front of the water line of "*Mountenay's Neck*," the fillings and extension of the ground out of the water, under said acts of Assembly and ordinances, even when combined, are wholly

incompetent to vest any right or title in Oulton, or any person claiming under him, to any part of the made ground in front of plaintiff's lot within the lines of "*Mountenay's Neck*," nor can any such interpretation be placed on the said grant, acts and ordinances, and if it could, neither the State, or mayor and city council, had any power to authorise such an invasion of the rights of private property, as to privilege Oulton, or any claiming under him, to build out and improve into the water, in front of the lots of the proprietors of "*Mountenay's Neck*," so as to acquire title to such improvement, and therefore there is no such subsisting outstanding title in Oulton, or any who may claim under him, to the property in dispute, as will bar the title of the plaintiff. *Brown vs. Kennedy*, 5 *H. & J.*, 195.  8 *G. & J.*, 479, *Delaware and Md. R. R. Co., vs. Stump.*  5 *G. & J.*, 367.  1 *Gill*, 501.  2 *H. & McH.*, 244.  2 *Howard*, 285.  6 *Gill*, 170.

6th. The court ought to have directed the jury, on all the facts of the case, and the law applicable to them, that the defendants had no title whatever to any part of the property claimed by the plaintiff, and it therefore erred in refusing the plaintiff's fifth and other prayers on this point, and that if for this cause or any other misdirection the judgment should be reversed, the case should be remanded, and for the reasons aforesaid, the court ought to have rejected the second and third prayers of the defendants.

*John V. L. McMahon* for the appellee.

This case has been argued often, and most of the points now raised have been put at rest by previous decisions of this court.

1st. *What is settled?*

The whole case begins with the act of 1745, ch. 9.  The object of that act was to *encourage* persons who were *riparian* proprietors to improve by filling up the water.  The act of 1773, ch. 4, authorises the annexation of eighty acres to the town of Baltimore, and gives to it the same privileges as the old town.  The act of 1783 appointed *Port Wardens*, and

gave them the power of directing how these improvements
into the water should be made.    1796, ch. 67, was the
charter of the city of Baltimore, and devolved upon the *mayor*
and city council all the powers formerly possessed by the
*Port Wardens.*    The city ordinance gave us the right to make
the improvements here made, and always recognised this
right up to the year 1821.    The first case was the case in
11 *G. & J.*, and was tried upon escheat patents, and decides
that the oldest patent should prevail.    At page 358 this
priority is settled.    The parties then went back to their orig-
inal patents, both of which were prior to the act of 1745,
which, for the first time, gave the right of improvement.
Both parties then stood at their common law rights as riparian
proprietors—there could then have been no priority.    But
this is settled and we do not question it.    But then the patent
of *"Bold Venture"* came to light, and they decide that this was
a *flat* bar to the plaintiff's case.    The question as to the effect
of the act of 1773 was before the court before, as the points
and *statement* of the parties in the other case show.    The pro-
priety of the prayers granted to us is affirmed by the former
decisions, and this court cannot correct its own decisions.
1 *Md. Rep.*, 395.    The prayers in the three cases are all the
same; this is admitted.

2nd. Now what is the new evidence?    The plat of the
improvement was in the case in 1 *Gill*, 485.    And the only
new evidence, (that of Bouldin,) is just what the plat proves
and nothing more.    The act of 1773 was a public act, and
was therefore before the court.    Every act which concerns
the public land is a public act, and the court will take judicial
cognizance of it.    10 *G. & J.*, 354, 355.    The act of 1745
was clearly a public act, and the latter is but a modification
of this.    The plat referred to the act of 1773, and was made
under it.    The act of 1829 authorises the reading of any
private statute from the statute books.    The plaintiff could,
therefore, in any event, have invoked the aid of this act.    As
to the effect of the *withdrawn* evidence relating to the escheat
of *"Bold Venture:"*    This does not affect the legal propriety

of the prayers granted. The act of 1745 did not give any party the right to improve except *upon the State's land*, and by withdrawing the evidence of the escheat, they have shown that they have no case under it. They have shown no possession; the only possession and improvement was by us. The title of *"Bold Venture"* began in 1695, and it was then a good title, not barred by adversary possession, and there is no presumption of its surrender to the plaintiff. This is sufficient for the defendants; and unless this title is brought back to the State— unless there is an escheat—(and there being express evidence of an escheat in 1754 which is now withdrawn,) the plaintiff has no title. The withdrawal of this evidence is fatal to his whole case. Where a case goes back and the plaintiff's case is the same, and the defendant's case is substantially the same, the decision is binding. Is the plaintiff's case unchanged? Upon this point there can be no dispute. And the same case now coming up for the third time, the adjudications in 1 *Gill* and 6 *Gill* are conclusive, for it would be an absurdity to say, that the case of the plaintiff was an answer to the whole of the defendants case, and not to *a part* of it.

This case is the same as in 6 *Gill*;—the law is the same— the authorities are the same—and the decision is therefore conclusive. That case decided that *"Bold Venture"* was a *flat bar*, and this *decision must be binding;* if the law is not to be regarded as settled, then the condition of society would be miserable indeed, *"ubi jus vagun ibi misera servitus."* The opinion of Judge Dorsey, in 6 *Gill*, is conclusive on the question of fraud on the Proprietary in obtaining the patent of *"Bold Venture,"* because of its being covered by water; but this question is also decided in this very case in 1 *Gill*. The question on the act of 1773 is also decided. The ground on which the attack was made on this point was before the court before. The *plat* of 1773 was in then and is in now; and it refers to the act of 1773, and to the addition of *"Mountenay's Neck"* to Baltimore town.

In face of all this, the Court of Appeals decided, that the grant of *"Bold Venture"* was a bar to the whole case. The act of 1773 is not a new grant of *new privileges.* It does not give the old town any new rights; it only grants to the *new town* the rights belonging to the *old town.* It, therefore, only gives to new lands rights granted by the act of 1745. There is no answer to the *two facts* of the *grant* and *location* of *"Bold Venture"*—there is no new evidence on this point. But again, he must show that the land escheated before 1773. This must be shown by showing that *Oulton* died intestate and without issue; but he has not made search for the will of Oulton or proved that he died without issue. There has been no search in the register's office, and the only evidence from which an inference can be drawn is, that the patent was granted in 1695, and no possession under it. But how could a man occupy land covered by navigable water? Lapse of time will not prove that a man has died without a will and without heirs, unless there is a search for will and heirs.

But there are *special objections* to the plaintiff's prayers. The first prayer assumes, that by the chain of title there stated, it has shown a complete chain of title from Mountenay to Henry Hammond, who appears in the case since the former trial as the heir of Mrs. Casey; and that upon this title Hammond is entitled to recover in this action. It takes no notice whatever of the title of *"Bold Venture,"* and therefore affirms, that under the title there set up, as derived from Mountenay and the act of 1773, the plaintiff is entitled to recover without regard to the title of *"Bold Venture,"* whether escheat or not, wherever it is or whatever its condition; and is therefore not only directly at war with all the former decisions, but is also wholly untenable even as a new proposition. This prayer is also objectionable, because it assumes that it has shown a complete chain of title from Mountenay to Hammond, whereas, under the locations and proof and the case put by the prayer, the plaintiff has not shown such a complete chain of title as entitles him to claim the property in controversy as the eldest riparian proprietor, by force of the title of Mountenay.

But there are also other objections to it, which are not only fatal to the prayer, but also to the plaintiff's whole case. Even if this complete chain of title is shown by the prayer, yet it also shows that the plaintiff had no *legal title*, or at all events *no legal title at the institution of this suit*, and is therefore not entitled to recover. 9 *Gill*, 275. Lastly, by the deed of Hammond to Anderson, (1 *Gill*, 443,) under which alone the plaintiff claims title, the title of Mrs. Casey ceased at her death, and Hammond, intervening in the cause as *her heir at law*, had no title, as such heir, to recover on in this action; the title, which, at the death of Mrs. Casey, pending this action, devolved not on Hammond, but on him and Mrs. Pinkney, was a new, distinct and independent title accruing to them, not as Mrs. Casey's heirs, but as grantees in remainder under the deed of Hammond, and as such, and as accruing after this action was brought, does not entitle the plaintiff to recover in this action. There must be a dying *intestate* before there can be an heir at law, and this fact must be negatived—the court cannot assume it. 2 *Md. Rep.*, 362. The act of 1831, ch. 311, sec. 11, does not help the case, for it expressly excepts cases where there is any beneficial interest in the trustee.

The second prayer asserts that the *mere death* of Oulton, at any time before the institution of the suit, (without any other fact whatever,) is sufficient to remove the bar of "*Bold Venture.*" The objections to this are obvious.

The fourth prayer asserts, that if Oulton died twenty years before the suit, then "*Bold Venture*" is not a good title, because the defendants had not offered any proof that Oulton, or any one claiming under him, had had possession of "*Bold Venture*," or any part of it. The objection to this is equally obvious, as it bars the title of "*Bold Venture*" by the mere fact of non-possession, and in the entire absence of any adversary possession as against that title.

The third, fifth and sixth prayers raise objections to the bar of the title of "*Bold Venture*," on the ground that the defendants are mere intruders, and cannot, therefore, protect

their possession by any outstanding titles in a third person, or one with which they have no connection or privity.    The decisive answer to these is, that it is precisely the same out-standing title set up by the defendant, under the very same circumstances as in the former cases, and by the court affirmed to be a bar; and that apart from these decisions, the privity of the defendant with the outstanding title is not necessary to make it available to protect their possession, if a superior title.    7 *Gill and Johns.*, 62.    1 *Md. Rep.*, 52.

The seventh, ninth and tenth prayers raise objections to "*Bold Venture*," on the assumption that it was escheat, after the withdrawal of the evidence as to the escheat of it and the death of Oulton.    Of the facts to be found by the jury under the tenth prayer, the plaintiff had *express and uncontradicted proof in the former case in the escheat* patent of 1759; and they were there held to be no answer to the title of "*Bold Venture*," and are therefore immaterial—the act of 1773 is *not itself* evidence from which, in connection with the other facts stated, the jury could draw the inference that Oulton died intestate and without heirs before 1773—nor, in the absence of any proof to show inquiry or search for heirs or will, and also looking to the ,fact, that until recently it was land covered by water, not susceptible of possession, and of which there was no adversary possession, do the facts stated warrant the inference of death intestate and without heirs before 1773.    What act of 1816 is referred to in the seventh prayer is not only not shown by the prayer, (which is essen-tial,) but also not even by the proof, there being no act of 1816 offered in evidence; nor is there any location of the limits described by that act; nor any proof that "*Mountenay's Neck*" is within them; the presumption of escheat *before* 1816 is, by the prayer, directed to be made upon *the single fact* of the absence of all proof of possession by Oulton, or any one claiming under him; and lastly, the jury are *re-quired or bound* to presume it.

As to the ninth prayer:    The effect of escheat before 1773, was raised in the former cases upon express proof of escheat

in 1759 and upon the plat of 1773, and was held not to affect the bar of "*Bold Venture.*" The prayer depends upon the finding by the jury that Oulton died intestate and without issue before 1773, and there is nothing in the prayer, (nor even in the proof,) to justify that finding; and lastly, the prayer, in failing to specify any act of 1773, either in terms or by clear reference, raises no question upon any particular act of that year. The prayer also errs in assuming that by Bouldin's proof, "*Mountenay's Neck*" was added to the town in 1773, the proof being that only a part of it was added as shown by the plat.

The eighth prayer raises an abstract point, immaterial and furnishing no ground for reversal, if the defendant's prayers as to "*Bold Venture*" were rightly granted. 1 *Gill*, 19, 25, 30. 9 *G. & J.*, 324. We are not trying a case where the land is embraced within the plaintiff's patent, but where the land is in the State, and he cannot show that the title came back to the State. Upon the whole we insist, therefore:

1st. That by the former decision in this very cause, as well as that on the second appeal in Wilson's case, the legal correctness of the defendants' prayers is conclusively established, and is no longer an open question; that the prayers being the same, their correctness is necessarily established, unless there is clearly shown to be some material variation as to the points presented by those prayers, between the evidence in the present and that in the former cases: and that there is no such variation, the only evidence withdrawn being that as to the escheat of "*Bold Venture*," which withdrawal, if affecting at all, only gives additional strength to said points, and the evidence in the case, with this exception, being the same or substantially the same, as to those points, as on the former appeals.

2nd. That the correctness of the defendants' prayers, thus conclusively established, necessarily negatives every point in conflict with them. And by reference to them, as granted in this case and affirmed by both of the former decisions of the Court of Appeals, it will be seen that they maintain "that

'*Bold Venture*' is a bar to the plaintiff's recovery, upon no other facts to be found by the jury *but the grant, and the true location by the defendants of* '*Bold Venture*,'" and maintain this in the face of, and against all the, evidence in the cause— and under the authority of the well established decisions of this court, these prayers could not have correctly been affirmed, if there were any evidence in the cause, or any inferences which a jury could properly make from it, to affect the correctness of those prayers, and that their affirmance is therefore necessarily a decision, that these single facts of the grant and the true location of "*Bold Venture*" make it a bar to the plaintiff's recovery in the face of, or notwithstanding all the, other evidence in the cause and all inferences from it, and, therefore, necessarily negatives every point which would assert that "*Bold Venture*" is not a bar, upon that other evidence, or any part of it, or any inferences from it.

3rd. That the plaintiff's prayers, so far as they are material to the case, or would deny that "*Bold Venture*" is a bar to the plaintiff's recovery, although granted as proved and truly located, are all of them founded upon evidence which was before the court on the former appeals, or some fact to be inferred by the jury from that evidence, and were therefore properly rejected.   And that even if the questions presented by them were open questions, they, so far as they are material to the appeal, not only conflict with the former decisions as to the effect of "*Bold Venture*," but would be untenable if there had been no such decisions.

*Reverdy Johnson* on the same side.

1st. The questions which have been settled:   The plaintiff claims title as owner of part of "*Mountenay's Neck*," and the privileges granted by the act of 1745, ch. 9, and 1773, ch. 4. The defendants in the first case claimed title under *Fell's Point*.   The land in dispute was made by filling up the water, and this was done by the defendants, and paid for by them. The first case decided, that owners of "*Mountenay's Neck*" were entitled to priority of right on account of seniority of

patents, as against the owners of *Fell's Point;* that the evidence as to the filling up was irrelevant, and that the plaintiffs were entitled, no matter how filled up.   When the case went back the defendants defended themselves under the title of *"Bold Venture,"* which was older than *"Mountenay's Neck,"* in *reference to the act of* 1745.   The patent of *"Mountenay's Neck"* was granted in 1663; in 1695, *"Bold Venture"* was granted to Oulton, and its first line calls to run *with "Mountenay's Neck,"* as to its second and third lines.   At this time the act of 1745 was not passed, and the owners of *"Mountenay's Neck"* had then no right to fill up.   The plaintiffs base their claim exclusively upon the act of 1745.   This court, in 1 *Gill,* have decided, that the act of 1745 was to be construed in subordination to the rights of grants then existing.   They have also decided in that case, that *"Bold Venture"* was properly located, as insisted by the defendants, and embraced the property in dispute.   The plaintiffs then attempted to assail the patent of *"Bold Venture:"*—1st. Because the State, by the original grant to Mountenay, in 1663, giving the lines to the water, the power to grant *"Bold Venture"* was gone. 2nd. The particular grant was void, on the ground of fraud in obtaining the patent of *"Bold Venture,"* because it was land covered by water.   The court decided both these objections to the grant of *"Bold Venture,"* and by this decision have established:—1st, that the patent of *"Bold Venture"* was a valid patent; 2nd, the true location was that made by defendants, and covered the land in dispute in this case. The direct point then before the court, and the only one on which the defendants could have stood, was the legal effect of the grant of *"Bold Venture"* upon the plaintiff's *title.*   1 *Gill,* 478, 511.   The first prayer of the defendant is on page 478, and this is disposed of on pages 511, 512.   The court, though they do not expressly refer to the act of 1773, yet the principle of the decision would apply as well to this act as to the act of 1745.   It is, that *"Bold Venture"* is a good title, and that the act of 1745 does not give the power to the owners of *"Mountenay's Neck"* to improve over the land

granted by the patent of "*Bold Venture.*" This, of course, settles the power to grant "*Bold Venture,*" and that all objections to it, except the single one referring to the act of 1773, have been overruled.

The act of 1790, under which *procedendos* are granted, necessarily makes the decisions of the appellate court in that case decisive on the second trial, and if the court below follows this decision, there is no error in their action whatever, the appellate court may *afterwards* think of the propriety of its first decision. 3 *H. & J.*, 462. The case of *Hammond vs. Ridgely*, 5 *H. & J.*, decides nothing upon the question. See *Judge Buchanan's opinion in that case*, 278. They all hold, that in *the case* the decision of the appellate court is decisive, no matter whether they afterwards changed their opinion or not. And again, this case does not come within the rules there laid down by any of the judges. There is here no egregious mistake or any great rule of public policy to be settled. I assume, then, that whatever has been decided by the Court of Appeals in this case, is to be regarded as the settled law of the case. This court has not the legal right or power to change the law of this case, as heretofore decided in it.

The validity and operation of the grant of "*Bold Venture*" is therefore *settled.* The effect of the act of 1745 upon the title of the plaintiff, is *identical* with that of the act of 1773. What then is supposed to be open? There are but two grounds:—1st. That the act of 1773 is now supposed to be first introduced as evidence. 2nd. Evidence supposed to show that at the date of that act "*Bold Venture*" had escheated to the State. In 1 *Gill*, 484, is an agreement in relation to *the plat of* 1773. This agreement shows that there was before the court below, and of course before this court, the plat of the addition to the town in 1773. This plat will show that it was made under the act of 1773, *ch.* 4. In that case also they had evidence of the escheat of "*Bold Venture,*" and evidence of "*Roger's Inspection.*" This escheat warrant is *prima facie* evidence that the original patentee had *died*

*without* issue *at the date of the warrant,* which was in 1759, subsequent to the act of 1745. They now withdraw all the evidence relating to "*Roger's Inspection,*" and that relating to the escheat of "*Bold Venture,*" *both record and parol,* they intended to try the cause under the *procedendo,* without *any evidence* of the escheat of "*Bold Venture.*" Now concede that the act of 1773 is for the *first time brought to this court in this appeal,* what *effect* has this act, standing by itself, upon Mountenay's title, independent of the escheat of "*Bold Venture?*" It was nothing more than the effect of the act of 1745 upon the same *grants.* This act of 1773 only places the owner of the land *added,* on the same level as to rights and privileges with the owners of the land *in* the *old town.* The same thing, therefore, which would inhibit the owner of the land in the old town from improving their land into the water, would also prevent the owner of the eighty acres added by the act of 1773. Now if "*Bold Venture*" is a flat bar under the act of 1745, it must also be, aside of the question of escheat, a flat bar under the act of 1773. So the introduction of the act of 1773 leaves the parties where they stood before, (1 *Gill,* 512,) because it left "*Bold Venture*" still an outstanding title.

Is there any evidence of the escheat of "*Bold Venture*" before 1773? I see none, and there is in the former trial no evidence of this escheat, except that which was withdrawn in this case. The whole supposed evidence on this subject is hypothetically put in the plaintiff's tenth prayer. The ninth prayer admits, that the plaintiff's right to recover under the act of 1773, *depends upon the escheat* of "*Bold Venture.*" The tenth prayer contains this supposed evidence. This goes upon the assumption that the legislature would not pass the act of 1773, unless they had title to "*Bold Venture,*" but this does not follow. These acts do not relate to the lots themselves, but is a general act, that *wherever* there are lots bordering on the water, the owners thereof may improve into the water. "*Bold Venture*" was then granted, and the fact that it was covered by water did not give the right to Mountenay

to improve upon it, any more than if it had been fast land. The mere fact of the grant of "*Bold Venture*" in 1695, is no evidence that it had escheated in 1773. But the second proposition is as to the *age of John Oulton* when the grant in 1695 was made. But this is no evidence that he was dead in 1773, *without heirs.* He would be then but ninety-nine years of age. Then again the third proposition is as to the *non-claim of possession* by Oulton, or any person under him. In the former case it was decided as against the defendants, that the fact of non-possession under the *Mountenay title*, would not bar the claim of the plaintiff, because the land was covered by water and possession could not be taken of it. Now if that was good as against the defendants, the same ought now to be held as against the plaintiff. Again, the non-adduction of a will is insisted on, but the fact that a party dies without a will, is no evidence that he died without heirs, either collateral or lineal. But the queston is not open; because the court in the former case have ruled two propositions, either of which will bar the plaintiff, and, in 6 *Gill*, have decided the whole question.

As to the eighth prayer, the court will not lay down abstract propositions which have no foundation in the evidence in the cause. 2 *Howard*, 843. The rule is gratified by showing, that the title is somewhere existing in some party who could, upon it, maintain ejectment, which was this case. But there is no ground of reversal if the court think our prayers were properly granted, because under them the plaintiff could not have recovered.

*Grafton L. Dulany* for the appellant, in reply.

1st. The subject of dispute is one of vast value, and the rights of the parties to this suit will determine those of many others similarly situated. If this judgment is affirmed, there will be a large tract of land left without an owner worth three or four millions of dollars. The defendants have no title, and it has been decided that they have none. Their defence is strictly a *technical* one—an outstanding title in a

*third party*, yet they do not pretend that any third party is in existence who could recover against either party to this controversy.

It is said that whatever questions were *expressly*, or *sub sulentio*, or by inference, decided in the other cases, must *bind* here. And the position is even assumed, that if there was evidence which the plaintiff *might have* offered and did not offer, he is bound. But this was a trial under a *procedendo*, and we had a right to alter the case. 8 *Gill*, 39.

The second, fourth, seventh and eighth prayers all proceed upon the same principle under a new state of facts, and that is, that a defendant in ejectment may plead an outstanding title for his protection, but it must be a *subsisting*, *available* title upon which a party could recover in ejectment against *both* the contending parties. These prayers were refused; and the question is, whether this refusal was legally correct? There is nothing *abstract* in the eighth prayer, for it would have decided the case. It was granted in the other case by Judges *Archer* and *Le Grand*. 6 *Gill*, 161. These prayers go upon the ground, that there is no proof respecting Oulton, whether he is dead or not, and, therefore, that the title that was once in him is now in us to support our *prima facie* case.

The whole extent to which Judge Buchanan goes in the case in 5 *H. & J.*, 276, *Hammond vs. Ridgely*, is to show that the judgment of the Court of Appeals is only conclusive on the court below. There is no constitutional or statutory prohibition upon this court to prevent a reversal of its *own decisions*. The writ of *procedendo* was provided for the purpose of preventing the delay of a new suit, which was before required in case of the reversal of a judgment.

The plaintiff has a good *prima facie* title, as shown by the cases in 1 *Gill* and 11 *G. & J.* This has been so decided, notwithstanding what was said in regard to the deed to *Hammond*. *Anderson* is the naked trustee, and the *act of* 1831, *ch.* 211, *sec.* 11, devolves the estate upon the heir at common law. The chain of title is perfect within the boundaries of "*Mountenay's Neck.*" Then we claim under the

21    v.4

act of 1773, as extending the act of 1745, and also under the act of 1816, ch. 29.  The decision in 11 *G. & J.*, 358, 359, decides, that we have the right to make the improvement, and that it avails for the benefit of the eldest riparian proprietor in cases of doubtful or conflicting titles.  It is assumed, therefore, that the title in the plaintiff is perfect, and *now* the outstanding title is simply set up.  Why will an outstanding title bar?  It is because if there be a recovery by the plaintiff, he will be ousted by the third party, whom the court say has good title.  In this case the principle would avail to protect a wrong doer, which cannot be done.  But again, this title must be *subsisting* in some person *in existence* capable of suing and maintaining the suit against each party. A plaintiff must prove a title from the State, and when the defendant sets up an *outstanding title*, he must show the same proof as the plaintiff.  3 *Johns. Rep.*, 380, 381.  Here no person appeared, and the court say the presumption is that the title was gone.  4 *Johns.*, 210.  3 *Wash. C. C. R.*, 498, 501.  6 *Johns.*, 257.  3 *Wheat.*, 224.  2 *H. & J.*, 125. He must show that the parties claiming under the outstanding title are in existence.  It would be the greatest abuse of the principle to permit its use as attempted in this case.

2nd. Was there evidence of Oulton's death before 1773? Before there was documentary proof, which the court rejected. The evidence is, that the patent to Oulton was granted in 1695, and this is the whole; in 1773 a title to enter the land thus covered by water was granted to the riparian proprietors. Oulton is presumed in law to be dead.  There is no one coming forward to claim this land.  This very absence is evidence, calculated to show that the title of Oulton has long since gone and been reinvested in the State.  This, taken in connection with the acts of the legislature, is conclusive.  1 *H. & McH.*, 206.  A simple adduction of the patent to the plaintiff will entitle him to recover.  This assumes that the State has the title or she could not grant it; and he who impeaches it must show that the State had no power when it exercised the right of granting by the act of 1773.  The

State cannot give what it does not possess, consequently the granting of a patent necessarily supposes that the State had title. The act of 1773, therefore, supposes the title to be in the State at the time of the passage of that act, which gives to all riparian owners the right to improve into the water. Until the contrary is proved, it is presumed that the State had this right, which it exercised by the act of 1773. What is the proof that she had not the title? It is the fact, that in 1695 she had granted the land to Oulton; but this does not destroy the presumption, that at the date of the act of 1773 the State had title, because the presumption arises from the act itself.

The court have not decided any thing upon the effect of the act of 1773. It was not relied upon in argument, nor is it in any manner alluded to in the opinion of the court in that case. As a *title paper*, it has never been under the consideration of the court. The law of 1773 is public to a certain extent, but this does not prevent its being a private law. *Dwarris on Stat.*, 9 *Law Lib.*, 34.

The granting of the *three prayers* of the defendant does not alter the case. The *court*, in the former *case, granted* these prayers, and still *reversed* the *judgment and sent the case back.* If this is conclusive, then the case must be now reversed again.

The right to improve is a sort of incorporeal hereditament annexed to the land. 4 *G. & J.*, 144. The act of 1773 as a grant, had, in all respects, the effect of a grant. You will presume title from a law as well as from a patent. 12 *Pet.*, 454. 2 *Howard*, 344. The act of 1784 is referred to in 11 *G. & J.*, as being a *strong confirmation* of the act of 1745.

11 *G. & J.*, 361, gives the construction to the act of 1745, and gives the title to the elder riparian proprietor, and asserts that the right to improve is property; so also it is decided in 1 *Gill*, 501.

The rights of riparian owners is that of alluvion, and has its foundation in the patent, and is co-existent with it. This

right of improvement, granted by this statute, harmonizes with and is an extension of the right of alluvion. There is no difference between them, except that the one is made by nature and the other artificially. This right, it has been decided, attaches to the oldest title. 11 *G. & J.*, 358.

At common law the riparian right of alluvion is incident to every riparian owner. They subsist in the original patent. 5 *H. & J.*, 200, 203. It has never been decided that it is competent for the State to grant land to another covered by water, in front of land granted by an elder patent, so as to prevent the rights of alluvion attaching to the riparian owner. 2 *Md. Ch. Decisions*, 485. 5 *G. & J.*, 367, 375, gives an interpretation to the act of 1745, and recognises most fully the rights of riparian owners, which cannot be violated even by the legislature. 4 *H. & McH.*, 547. These authorities are also referred to in 1 *Gill*, 501, and approved. The only difficulty is that that case is in direct conflict with the principles of those cases, and of the principles in the case itself. 2 *Md. Ch. Decisions*, 486. 6 *Gill*, 170. 9 *G. & J.*, 510.

In 2 *H. & McH.*, 244, part of the land now in dispute was adjudicated upon, and that case is conclusive of this.

TUCK, J., delivered the opinion of this court.

We are of opinion that the Court of Appeals has already settled most of the questions presented by the record before us. 11 *Gill & Johns.*, 351. 1 *Gill*, 430. 6 *Gill*, 121.

It is said, however, on the part of the appellants, that in view of the large amount of property involved in this case, and in another in this court, and of other property held under similar titles, it would not be improper for us to revise and overrule the opinions of our predecessors if we should think that they erred in deciding the cases which we have mentioned. The appellants found their right to recover upon the act of 1745, ch. 9, and other acts and ordinances of the city of Baltimore, in connection with their title as owners of part of a tract of land called *"Mountenay's Neck."* These have received a construction without which the grant of *"Mountenay"*

can be of no service to the plaintiffs in maintaining their action ; yet, while they contend that that interpretation must be adhered to, as the law of the case, by which valuable improvements made by others under a mistaken view of the law, and without any cost to the appellants, will be secured to them, unless the claim be defeated on other grounds, we are told that other opinions of the same learned tribunal pronounced in these cases, after full argument and consideration, are not to be regarded as authority. We have not been able to discover a sufficient reason for making this an exception to the almost uninterrupted practice of all courts, of receiving their own decisions as of binding force. We are not prepared to say that cases will not arise in which we shall feel ourselves constrained to, withhold our assent to adjudged cases. The reported decisions show that this has been done, and it may occur again. But, in the language of Mr. Justice Earle, whose opinion has been invoked by the appellant's counsel on this question, "the solemn adjudication of an appellate court of last resort, ought, on general principles of judicial propriety, to be approached with caution, and perhaps they should never be disturbed, except to settle some great rule of property the public interest requires to be reviewed. On a second trial in ejectment between the same parties, and those claiming under them on the same subject matter, I should say they ought to be considered conclusive, unless, which is hardly a supposable case, glaring injustice has been done, or some egregious blunder has been committed. But to give the binding decision those conclusive qualities it ought to be explicitly declared, and perfectly understood, and, to become the law of the case, it ought definitively to settle the rights of the litigant parties. If an exposition is given to a will or deed (and so of an act of Assembly) fully defining the rights of the parties, or any other opinion is expressed settling the title to the thing in dispute between them, it should be deemed irrevocable, and never again touched, where the same persons and those claiming under them, are concerned in the contestation. If the Court of Appeals have disposed definitively of the subject, and fully and explicitly determined the rights of the parties, this court ought to yield to

the judgment, whatever our individual opinions may be of its correctness. This is not, however, in my apprehension the character of that decision ;" &c. 5 *Har. and Johns.*, 278, *Hammond vs. Ridgely.* We do not understand the counsel for the appellants as denying that, if on a second appeal it appears that the court below ruled in conformity with the principles settled by the previous decision, their judgment must be affirmed. It is manifest that in such a case no error can be imputed to the inferior tribunal. 7 *Gill*, 244, 333. 1 *Md. Rep.*, 394. But it is said that we are not concluded by the opinion in *Wilson vs. Inloes*, though involving substantially the same titles and relating to property in the same city, and similarly situated. The Court of Appeals in 1 *Gill*, and 6 *Gill*, followed the decisions in 11 *Gill and Johns.;* and so in 6 *Gill*, they considered that what had been settled in 1 *Gill* was no longer open for consideration. If as a general rule upon principles of judicial propriety, and in view of the importance of having the law fixed and certain, a court respects its own decisions even in analogous cases, there would seem to be more reason for adhering to them where the facts are the same, though between different parties. These cases demonstrate that neither the counsel nor the court were insensible to the importance of the subject before them. Three of the four judges who sat in *Wilson vs. Inloes*, 6 *Gill*, had decided *Casey's* appeal in 1 *Gill*. After full argument and consideration the judgment of the court below was affirmed, in which C. J. Archer had united, so that we have the authority of five of the judges for what was there decided. Far from there being any reason, on the ground of public interest, or manifest error, for our reviewing that opinion, we feel no difficulty in recognizing it as an authoritative decision. Whatever, therefore, was decided in 1 *Gill* and 6 *Gill* must be taken as the law, unless it appears that the record presents a materially different case. The lessors of the plaintiffs, *Wilson and Casey*, claimed certain lots in the city of Baltimore, shown by the plat at page 487, 1 *Gill*, as incident to their ownership of parts of a tract of land called "*Mountenay's Neck*," patented in 1663, which lots had become fast land by improvements made

into the water, under the act of 1745 *ch.* 9, *sec.* 10, and other acts and ordinances of the corporate authorities of Baltimore, mentioned in the proceedings. It is conceded that no part of the property in controversy is embraced within the lines of "*Mountenay.*" The Court of Appeals in 11 *Gill and Johns.*, 351, decided, that the act of 1745, granted a franchise to the owners of water lots; that the vested right of improvement thereby conferred, and all improvements when made, no matter by whom, enured to the benefit of those claiming under the senior grant in that case, that is to say, that they became incident to " *Mountenay's Neck*," and not to " *Fell's Prospect*" which was patented after the passage of the act ; and also that the improvements authorised by that act were those to be made by improvers in front of their own lots, not of their neighbors, as had previously been settled in 5 *G. & J.*, 368. The defendants, in both cases, afterwards, adapting their defence to this construction of the act of Assembly, and to show that the owners of " *Mountenay*" had no authority themselves, to extend their water line, and could not, therefore, claim the improvements made by others, offered in evidence the patent of " *Bold Venture*" granted to Oulton in 1695, by which, as they said, the State had, before the legislative grant of 1745, parted with all interest in and right over the land adjoining the water line of " *Mountenay*," as shown by M. N. on the plat. The court decided that the State had authority to make this grant although the land was covered by navigable water, and that the patent was not void for any reasons assigned by the appellant's counsel, and which have again been urged before us. The necessary consequence of this pretension of the defendants, if sustained by the court, would be to defeat the plaintiff's actions, unless they could show that the State had, before the passage of the act of 1745, become reinvested with the title to what had been previously granted to John Oulton ; because, if the State did not then own " *Bold Venture*, there was nothing on the water line *M. N.* of "*Mountenay*," on which the act of 1745 could operate in favor of the owners of that tract. They could not have extended their improvements beyond that line without encroaching upon the property of

their neighbors. Accordingly the plaintiffs offered evidence to show that *"Bold Venture"* had escheated before the year 1745. The Court of Appeals, however, decided that such was not the effect of the evidence offered on this point, and that, as the act of 1745 did not grant any right acquired by the State subsequently to its passage, the pretensions of the plaintiffs, as derived under that act, must yield to those claiming under *"Bold Venture,"* patented in 1695. The defendants in this case had prayed the court to instruct the jury that " if they find that the tract called *'Bold Venture'* was granted as given in evidence by the defendants, and that the same is truly located on the plats, then the patent of *'Mountenay's Neck'* gives no title to the lessor of the plaintiffs, to the lot of ground for which the defendants have taken defence." This instruction the Court of Appeals ( 1 *Gill* 511,) held, should have been granted. *" Bold Venture"* embracing all the land between the line M. N. and the city dock, covers, of course, the ground now in controversy, as effectually as if it had been fast land at the time *"Bold Venture"* was originally surveyed;" and (on page 512) *" ' Bold Venture'* bars the plaintiff's recovery against any of the defendants ;" " we approve the refusal to grant the plaintiff's prayer in the fifth exception," which was that upon the hypothesis there stated, the plaintiff was entitled to recover against all the defendants except Inloes. In *Wilson vs. Inloes*, 6 *Gill*, the defendants offered three prayers, identical with those offered by them in the present case, as to which this court said, (page 171 :) "In granting the three prayers of the defendant the court below merely carried out some of the undeniable rules of our ejectment law, and sustained the principles decided in *Casey vs. Inloes*, 1 *Gill*, 430." These extracts clearly indicate that the Court of Appeals were of opinion that *"Bold Venture"* was a complete bar to the plaintiff's actions, so long as they failed to show that it had escheated to the State prior to 1745. But the counsel for the appellants contend that if this had been the view of the court they would not have sent the case back for a new trial, and they rely upon what is said by the court at page 510, as evidence that the court did not intend to conclude

them by the opinion and judgment in that case, viz : " as far as regards any conflict of rights between these parties, Inloes and the other defendants had, under the act of 1745, a right to extend westwardly, in front of their lots, to the line of the eastern end of the city dock, extended northwardly ; that is to say, to the west side of Caroline street, and no further ; and the lessor of the plaintiff had the right to extend her grounds to the city dock, at the south side of Lancaster street. Upon the foregoing views the plaintiffs' fifteenth prayer ought to have been granted." Although a procedendo will not be granted when this court can see that the plaintiff must fail in his action, it does not follow that the granting such writ implies that he must ultimately succeed ; and it could not have been discovered, from an inspection of the record, that the plaintiffs would not on another trial be able to meet successfully the defence on which the defendants had relied, by removing *"Bold Venture"* out of their way. As to the passage of the opinion above quoted it may be remarked that we must consider what the court said in connection with the subject matter of the prayer then under consideration. They were disposing of the exceptions in their order ; not one word is said of *"Bold Venture"* in that part of the opinion, but it treats of a different portion of the evidence, and the rights of the parties to improve in front of their lots under the act of 1745, and without reference to the grant of *"Bold Venture."* But when the court, in order, reach the prayers of the defendants we perceive that they consider *"Bold Venture,"* in the face of all the testimony, as a flat bar to the plaintiffs' recovery ; and, therefore, approve of the court's refusal to grant their second prayer in the third exception, and their prayer in the fifth exception, in which that title had not been noticed by the plaintiffs.

But it is contended that this case is now different in material respects, from what it was on the trial of the former appeal ; and this difference is supposed to consist in the withdrawal of all the testimony relating to the escheat of *"Bold Venture,"* and to the death of Oulton ; and to the boundaries of said tract, and of the patent of *"Roger's Inspection,"* and all papers relating thereto ; and in the offering of the act of 1773,

ch. 4, which it is said was not before in evidence. The case on the part of the defendants is the same. It is manifest that the abandonment of all questions as to the locations of the title papers cannot alter their construction or effect upon each other. On the former appeal it was held that the evidence then offered to prove the escheat of "*Bold Venture*" before 1745, was insufficient for that purpose. It is now contended, that in the absence of that testimony, and upon the present condition of the record, it may be inferred that Oulton died intestate and without heirs before 1773, when, as it is said, that part of "*Mountenay*" was added to Baltimore town, and the privileges of the act of 1745 were extended over it. According to this view of the plaintiff's case they abandon the act of 1745, except as evidence to show what "immunities and privileges" were conferred upon the owners of "*Mountenay*" when it became part of Baltimore town under the act of 1773, and they claim title from the time of the passage of that act. Having, as we suppose, stated substantially the case as now presented we proceed to dispose of the prayers, all of which on the part of the plaintiffs, in our opinion, were properly refused. As to the first, we deem it unnecessary to inquire whether the present appellants were properly made parties, after the death of Mrs. Casey, because, this prayer being obnoxious to other objections, it is proper to dispose of it on these grounds. The object of the act of 1745, (and the effect of that of 1773, according to the view now taken by the appellants' counsel) was to authorise the owners of water lots to acquire a right to vacant land covered by water, without applying to the land office in the usual way. It was a legislative grant of a franchise for and in consideration of certain improvements from which material and important benefits would result to the public. These improvements could have been made only on vacant property of the State, such as she could rightfully grant. The former decisions of this court have conclusively settled that this right did not belong to the owners on the water line M. N. of "*Mountenay*," because the land outside of and adjoining that line had been previously granted by the State to John Oulton, in the legitimate exercise of her author-

Hammond's Lessee, *vs.* Inloes, *et al.*

ity.  This prayer assumes that when this part of "*Mounte-nay*" became part of Baltimore, under the act of 1773, the privileges conferred by the act of 1745, attached to and became vested in the owners of water lots, on that line ; and that it operated as a grant to improve in front of their lots on that line, and that, therefore, if the jury should find certain facts enumerated in the prayer, the plaintiffs were entitled to recover, without the prayer's taking any notice of the patent of "*Bold Venture*," or submitting to the jury any hypothesis upon which they were required to find, as preliminary to the plaintiff's title, that Oulton's had become extinct prior to the act of 1773.  It was argued, on the part of the appellants, that what the State does is presumed to be right until the contrary appears, and that we must, therefore, suppose that the State had title to this property when that act passed.  If we were now dealing with an act of Assembly professing in terms to grant a particular parcel of land the argument might apply. But there is a plain distinction between such an act or a patent specifying the thing granted, and an act which grants a right generally, and operates merely in favor of those who may subsequently show themselves entitled to the benefit of its provisions, as being in a condition to avail themselves of the franchise.  An escheat patent is *prima facie* evidence that the land was liable to escheat at the date of the warrant, and an act of Assembly reciting that the property had escheated, and making a grant, would have the same effect.  Suppose, instead of this act of 1773, the appellants had relied upon a patent of the same date granting the land in dispute, but silent as to Oulton's title, and that the question was between the patent of 1695 and the one now supposed, (as it is here between that patent and the supposed legislative grant of 1773,) can it be doubted that the elder grant would prevail, if relied on by the defendants, unless it appeared that the title to "*Bold Venture*" had gone back to the State before 1773?  If, however, the junior grant recites an escheat, the elder patent must give place to it, unless it be shown that the land had not escheated.  The *onus* of proof is shifted.  *Hall*

*vs. Gittings*, 2 *H. & J.*, 122. A plaintiff must recover upon his own title. If he shows a case entitling him to recover, the defendant must answer that case or submit to a verdict. But here the plaintiffs' pretensions, so far as founded upon the grant of "*Mountenay*," and the act of 1773, were repelled, by showing that before 1773 the State had parted with all that she had owned in front of "*Mountenay*." As a reply to this, the prayer asserts that Oulton had died intestate and without heirs, for which, as a presumption of law, we think there was no warrant; and if it was designed to have been found by the jury, it was error not to have been so submitted to them. "It is a general presumption, that things once proved to have existed in a particular state are understood as continuing in that state, until the contrary be established by evidence, either direct or presumptive. Thus, where seisin of an estate has been shown its continuance will be presumed." *Best on Presumptions*, ch. 6.

But can this be said to be an open question? It appears that the plat of the addition to Baltimore was before the court on the former appeal in this case, and the act of 1773 was necessarily, also, before the court; because, apart from the reference by the plat to the act under which it was made, operating as a grant of the public domain, and affecting the rights of navigation and fishery, by allowing improvements to be made out into navigable water, we think it must have been judicially noticed by the court as a public law. But in the case of *Wilson vs. Inloes*, 6 *Gill*, both the act and the plat were in evidence. It cannot be said that the point now made was passed over without notice. The notes of the counsel, taken by the reporter, show, that the title of the plaintiffs was strongly pressed in the argument before this court, in connection with this plat and act of Assembly. True, the court does not advert to that portion of the argument, but we cannot suppose that the plaintiffs would have been denied the benefit of it, if the court had considered that the patent of "*Bold Venture*" had been fully met, and put out of the case. We are disposed to think that the title now

set up was classed by the court with those points on which it was not deemed necessary to express any opinion, because they had been settled in 1 *Gill.* See 6 *Gill,* 159.

The *second, fourth* and *eighth* prayers relate to the question of outstanding title. We do not think that the doctrines of the law applicable to this defence in ejectment can avail the plaintiffs in this case. The plaintiff must always, in the first instance, make out a legal and possessary title to the premises in question, and the defendant's evidence may be confined to falsifying his adversary's proofs, or rebutting the presumptions which may arise from them. He need not offer any evidence of title in himself, or of title in a third person. It is sufficient if he makes it appear to the jury that a legal and possessary title does not subsist in the plaintiff. *Adams on Ejectment,* 285. 7 *G. & J.,* 62. 2 *Greenlf. on Ev., sec.* 331. And this the defendants here do, by showing that at the time when the title is said to have passed from the State, by the act of 1773, she had no title which she could have conveyed. There can be nothing clearer than that a plaintiff must be defeated, if it appears that the party under whom he claims the land in dispute had no title, no matter in whom the right may really be. But if he shows a *prima facie* case, the burden of proof is thrown upon the defendant.

As to the absence of proof of possession mentioned in the *fourth* prayer, it may be observed that the nature of the property was not such as to admit of possession and acts of ownership in the ordinary way. The patentee of "*Bold Venture*" could only claim in subordination to the rights of the public, as to fishing and navigation. And as this property was not made fast land until a few years before the commencement of the suit, we do not perceive how he could have claimed the possession before that time. The Court of Appeals have said, that the defendants could not have held it adversely by possession for this very reason. Whilst he was under no obligation to have made fast land out of the water, others had no right to invade his property. 1 *Gill,* 497.

The *third, fifth* and *sixth* prayers treat the defendants as

intruders, in the absence of proof of an available outstanding title. Much of what we have said applies to these; from which it follows, that, as the plaintiffs did not show a sufficient title, they cannot require proof of title in the defendants, or any third person. The *fifth* and *sixth* were properly refused for another reason. The former does not specify the property to which it was intended to apply, to wit: "the square from —— street to the water," neither the square nor the water being mentioned; and as the sixth is predicated on the fifth, it also was properly refused.

The *seventh* prayer was properly refused, because no act of 1816 had been offered in evidence; and if so, the particular act of that session is not specified in the prayer. The *ninth* prayer is obviously wrong, because it assumes the escheat of "*Bold Venture*" upon the death of Oulton without *issue*. But a similar point to the one designed to have been presented by this prayer is raised by the *tenth*, which asserts that the act of 1773 is itself evidence, connected with the facts stated in the prayer, that John Oulton had died intestate and without *heirs* before 1773. The Court of Appeals, with these facts before them in the former trials, did not recognise this pretension of the appellants, even when supported by the direct evidence offered on the question of escheat. We cannot perceive that the plaintiffs' case is made stronger by the absence of this testimony. The act of Assembly is not evidence, *per se*, of any thing in regard to John Oulton. It can only avail the plaintiffs as proof of certain facts of which there is no legal presumption, though they need not be established by direct proof. Nor does the law presume that a person who is proved to be dead left no heirs. The death of a person may be presumed after a long lapse of time, as was done in *Doe* on the demise of *Oldnall, vs. Deakin and Wooley,* 3 *Carr. and Payne,* 402, where the persons who were said to be dead, would, if alive, have been one hundred and fifty years old. When persons are known to have survived ninety and an hundred years, we cannot say that others have died at an earlier age, without some evidence on the subject. And, in addition to

the death of Oulton, the jury were to have found, by this prayer, that his whole race was extinct before 1773. For this, we think, there was not sufficient evidence. In an action of ejectment the lessor of the plaintiff claimed under a person who died without issue, but who had had a younger brother, who many years before went abroad, and, according to repute in the family, had died abroad, and the witness never had heard in the family that he was married. This was *prima facie* evidence of his having died without issue. "But where the death only is proved in such case, without some negative proof of the existence of issue, it is not sufficient, the plaintiff being bound to remove every possibility of title in another, before he can recover against the person in possession." *Richards vs. Richards,* 15 *East,* 293, *note.* 2 *Greenlf. on Ev.,* sec. 534. So far as this prayer is predicated on an absence of claim of title by persons representing Oulton, the character of the property, as before remarked on the *fourth* prayer, is a sufficient reason for its rejection.

From these views, it follows that we concur with the county court in granting the three prayers of the defendants, in doing which we but sanction what the Court of Appeals has said in the other cases substantially the same with this.

*Judgment affirmed with costs.*