## HOWARD *v.* EVANS.

---

EJECTMENT; SLAVE MARRIAGES; DEATH, PRESUMPTION OF; WILLS; TESTAMENTARY INTENTION.

1. A slave marriage is sufficiently established under the act of Congress of February 6, 1879, to legitimate the offspring of such marriages, where it is shown that the father and mother, owned by different owners, lived together as man and wife before the Civil war, and were recognized as such by their masters and by other slaves and people in the neighborhood, and had children who recognized each other as brothers and sisters. (Following *Jennings* v. *Webb,* 8 App. D. C. 43.)

2. In ejectment, where the plaintiff claims as sole heir of his brother, who died unmarried, a prima facie case is made by showing that the plaintiff and such brother and six others were the offspring of a slave marriage; that their father left his old home 40 years before the trial, when he was too old to have more children, and that no other issue were ever heard of; that 3 of the 6 others died in infancy, and the other 3 were taken to some unknown place in the South before the Civil war;

that the plaintiff, who continuously lived in the former place of family residence, had never heard of them for more than 40 years; and that he never knew of their marrying or having children; and that the deceased brother recognized the plaintiff as his only living relative. (Distinguishing *Posey* v. *Hanson*, 10 App. D. C. 496.)

3. Where an illiterate testator owning sublots 8 and 32 in block 594, after expressing in his will the wish to arrange his earthly affairs in view of death, devises "all of my real estate in square 594, sublot 32," to certain parties, and then directs "that my real estate be not sold for one year after my death, and that the proceeds shall go to the erection of a suitable monument over me and my beloved wife;" the will passes title to sublot 32 only, and, as to sublot 8, the testator dies intestate.

4. Whether under such a will, the proceeds of the real estate withheld from sale for a year will go to the erection of a monument, or whether the monument will be supplied from the proceeds of sale before division among the devisees of sublot 32,—*Quære.*

No. 1419.   Submitted May 17, 1904.   Decided June 8, 1904.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia upon a verdict directed by the court in an action of ejectment.          *Affirmed.*

The COURT in the opinion stated the case as follows:

This is an action of ejectment brought by the appellee, William A. Evans, against William J. Howard, to recover possession of lot 8 of R. B. Clark's subdivision of square 594 in the city of Washington.

It was agreed that both parties claimed title from a common source, namely, Bolden Evans, deceased, the plaintiff as heir at law and the defendant as executor.

The plaintiff testified as follows in support of his claim of heirship:

"That he was a brother of Bolden Evans; that he is about 70 years of age; and that he was born near Richmond, Virginia, and that he now lives at Swansboro, which is situated near Richmond,—within a few miles; that Bolden Evans lived in Washington, D. C., at 224 L street S. W., that witness knew the house,

and had visited his brother frequently; that Bolden Evans had lived in that house for a great many years, and that witness had visited him there at intervals of a year or two, once a year, and sometimes twice a year, stopping at the house with him; that Bolden had educated one of witness's daughters and one of his sons; that they went to Washington and lived at his house and attended school there for about 2 years; that witness occasionally received letters from Bolden Evans, in which he was addressed as 'brother;' that he and Bolden were sons of the same parents; that they were born in Virginia, before the Civil War; that witness remembers his parents well; that they were both slaves; that his mother belonged to one master and his father to another; that they lived together as man and wife, and recognized each other as such, and were so regarded by other slaves and people in the neighborhood; that his father was permitted by his owner to live with his mother, and his mother permitted by her owner to live with his father; that they were man and wife for great many years; that his mother bore 8 children to his father; that Bolden Evans was one of these and was 8 years older than witness; that all the children were born on the property of the owner of his mother, and continued to live there together and were raised by her; that they were all recognized by their father as being his children; that witness's mother and father were also the mother and father of Bolden Evans; that she never had another husband and never lived or cohabited with another man; that his father had no other wife than witness's mother, and he never lived or cohabited with any other woman than witness's mother; that they were regarded as husband and wife in the community in which they lived; that witness's mother died years before the war; that before the war his father was sold into slavery and taken to Texas, and that witness afterward learned that he died there; that he died before the war; that 3 of the children died when babies, and that the other 3, 1 older and the other 2 younger than witness were sold as slaves before the war and were taken South, he does not know where; that they were unmarried and had no children when they were taken from Richmond; and for more than 40 years witness has

never heard from or concerning them; that he never knew or
heard of their marrying or having any children; that he has
continuously resided in the neighborhood where he and his
brothers and sisters were born and raised; that he never knew of
his brother Bolden Evans, or anyone else, ever having heard of
these children or of their marrying; that witness frequently
visited his brother Bolden; that he visited him last in the fall
preceding his death and stayed several days in Washington,
living at Bolden Evans's house and sleeping in the same bed
with him; that Bolden Evans introduced him to a number of his
friends as his brother; that Bolden never had any children; that
he had been married, but that his wife was dead and left no
children; that Bolden lived in one house and rented the other.

"On cross-examination: Born a good while before the war;
was about 30 years old when war broke out; that he was a slave;
that his father and mother had 8 children in all; that 3 died
young and 3 others were carried down South; that since then he
has never heard of or from them; does not know whether they
married or not; denied that he had trouble with his brother
when he visited him in Richmond; admitted that his brother
slept in his shop while visiting him; he was a shoemaker by occu-
pation; brother owned no other real estate at the time of his
death, except the house and lot where he lived, and the one in
the rear, as far as witness knows; that when his father went
South to Texas he was too old a man to have more children.

"Redirect: That 3 children died in infancy; that the other 3
who went down South were not married and had no children at
that time; that he has not heard of them for more than 40
years."

Other witnesses were introduced to corroborate the foregoing,
and their evidence tended to show that Bolden Evans always
recognized plaintiff "as his brother and his only living relative,"
and that 2 of the latter's children lived with him about 2 years
and attended school in Washington.   It was shown that Bolden
Evans owned two lots in square 594 numbered, respectively, 8
and 32, and had caused their lines to be established by an official
survey in August, 1897; that lot 8 fronted on L street and was

occupied by a brick house in which he lived; that lot 32 fronted Clark street, and was occupied by a frame house which he leased to a tenant; that the fences were separate, and that the lots were separated by a public alley 4 feet wide.

It was also shown that Bolden Evans died February 22, 1901, leaving neither widow nor issue, and the defendant, as his executor, at once entered into possession of both lots, and has collected the rents therefrom since that time.

Defendant then read in evidence the will of Bolden Evans as follows:

The last will and statement of me Bolden Evans being of sound and disposing mind and wishing to arrange all of my
*do*
earthly affairs in view of death I     order and direct that Rev.
executor
William J. Howard, shall be [administrator]* of this my last will and statement and that he shall see that each of my lodges in represented at my funeral and that they pay their share of the funeral expenses.    And that my funeral take place in Zion Baptist church.

I also direct that all of my just debts shall be paid and that
in square 594 sublot 32
all of my real estate shall be sold and divided between my three lodges in three equal shares, Japa ⅓ Lodge of Masons No. 5 Rising, ⅓ Sun Lodge No. 1365 G. U. O. of O. F. of Oddfellows; Knights of Jerusalem ⅓ vno 7 St. Thomas Bro. Lillies side.

I order and direct all of my household goods and furniture shall be equally divided between Martha Ann Fantroy, Mary Westroy, and Wiley Westroy in view of there kindness to me in my sickness.    I also direct that my real estate be not sold for one year after my death and that the proceeds shall go to the erection of a suitable monument over me and my beloved wife in Hormonia Cemetry and that George W. Morgan shall be my undertaker.

his
BOLDEN x EVANS.  ·
mark

It was then proved that the better house has been rented for $8.50 per month, and the other for $7; that testator was a member of three orders, or lodges, named in the will.

The testimony having been closed, the defendant requested the court to give the following instructions to the jury:

"1. The jury are instructed, as matter of law, that no sufficient proof of the marriage of plaintiff's father and mother has been produced or offered in evidence, and that their verdict must be for the defendant.

"2. The jury are instructed, as matter of law, that by plaintiff's own testimony it is left uncertain whether there are not other heirs at law of the said decedent, Bolden Evans, and, if others, how many; he is therefore not entitled to recover in this suit, and their verdict must be for the defendant.

"3. The jury are instructed that by the terms of the will of said decedent, Bolden Evans, the title to the real estate in litigation passed under said will, and the plaintiff is not entitled to recover."

These were refused, and the court, at the request of the plaintiff, directed a verdict for the plaintiff. From the judgment rendered thereon the defendant has appealed.

*Mr. B. F. Leighton* and *Mr. W. C. Martin* for the appellant.

*Mr. Lucas P. Loving* and *Mr. Joseph D. Sullivan* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. There was no error in refusing the first instruction. The evidence was clearly sufficient to establish such a marriage between the parents of testator and plaintiff as brings the same within the operation of the act of Congress of February 6, 1879, enacted for the purpose of rendering legitimate the offspring of what were known as slave marriages. *Jennings v. Webb,* 8 App. D. C. 43.

2. The second instruction was properly refused, also, though

the appellant is right in his contention that it was incumbent upon the plaintiff, not only to prove his descent from a common ancestor, but also to show the extinction of any line of descent therefrom which might claim in preference to him.   *Posey* v. *Hanson,* 10 App. D. C. 496, 505, and cases cited.

The sufficiency of the evidence to show the death of the father of Bolden Evans and plaintiff, without other issue than that mentioned in the testimony of the plaintiff, is not seriously questioned.   He left his old home more than 40 years before the trial at an age when, as said by the witness, "he was too old a man to have more children."   Report of his death came back to his sons, and no further issue were ever heard of.

The evidence shows, however, that there were 6 offspring of the marriage besides the plaintiff and Bolden Evans.   Three of these died in infancy.   The other 3, 1 older than plaintiff (who was about 30 years of age in 1861), and 2 younger, were taken to some unknown place in the South.   They were then unmarried and had no children.   Plaintiff, who has continuously lived in the former place of the family residence, said that for more than 40 years he had never heard of them; that he never knew of their marrying or having any children.   Another witness who had known plaintiff and Bolden Evans in Richmond, before the latter removed to Washington, said that he recognized plaintiff as his only living relative.

We have heretofore recognized the rule that where a person has left his home or place of residence and has neither been heard from, nor of, by the persons, or in the places, where news of him, if living, would most probably be had, he may be presumed to be dead.   *Hamilton* v. *Rathbone,* 9 App. D. C. 48; *Posey* v. *Hanson,* 10 App. D. C. 496, 506.

In the case last cited it was also held that the additional presumption, that the person had left no issue, would not necessarily follow in all cases, and the refusal of an instruction involving the additional presumption in that case was sustained.

There was quite a difference, however, between the proof in that case and in this.

Two children of one Jane Willis, in whom, if living, the title

would have been, to the exclusion of the plaintiffs who were of distant kindred, had not been heard óf for 35 years by those who had mentioned their former existence.

In commenting upon the refusal of the plaintiffs' instruction, the court said: "The case of plaintiffs evidently proceeded upon the assumption that, if Jane Willis ever existed, she had no legitimate issue. The record shows no inquiry made for these children, or their descendants, at the old home of their mother and father in Charles county, Maryland, or anywhere else. The time since they were last seen or heard of is not long enough to warrant the presumption of their death in the ordinary course of nature, for many of the witnesses in the case were older than they would be if living." Then it was further said: "Moreover, this is not a case where the right depends upon the duration of one life only. Proof of death in such case must be followed by some evidence from which the jury may be allowed to infer that the deceased left no children or descendants. The law does not presume that a person 'proved to be dead left no children or descendants.' *Shriver* v. *State,* 65 Md. 278, 287, 4 Atl. 679; *Hammond* v. *Inloes,* 4 Md. 138, 174. The evidence was sufficient to justify the jury in finding that Jane Willis had 2 children born in wedlock. These children may have been alive at the time of the trial. If dead they may have had descendants living, and before a presumption of the extinction of that line of descent could be indulged there ought to have been some foundation laid in proof of inquiry and some attempt to trace the missing persons." Here the plaintiff is shown to have made the inquiry suggested as necessary in that case, and to have done all that was reasonably possible under the circumstances. He made a prima facie case which no effort was made to overcome.

3. Whether there was error in refusing the third instruction asked by the defendant depends upon the construction of the will of Bolden Evans.

By universal agreement the cardinal rule of interpretation is that the intention of the testator, expressed in his will or clearly deducible therefrom, must in all cases prevail where consistent with settled rules of law.

It is also well settled that a construction which will prevent a partial intestacy is preferred to one that will permit it, where it can reasonably be given. *Given* v. *Hilton,* 95 U. S. 591, 594, 24 L. ed. 458, 459; *Kenaday* v. *Sinnott,* 179 U. S. 606, 45 L. ed. 339, 21 Sup. Ct. Rep. 233; *Young Women's Christian Home* v. *French,* 187 U. S. 401, 411, 47 L. ed. 233, 236, 23 Sup. Ct. Rep. 184.

Bearing these rules in mind, we are of the opinion that the will did not pass the title to lot 8 in block 594, but is limited in its operation to the lot specifically devised, namely, sublot 32.

As to lot 8, Bolden Evans died intestate, and the title thereto passed to the plaintiff as his heir at law.

The contention on behalf of the appellant is that the words of the preamble, namely, "wishing to arrange all of my earthly affairs in view of death," and the further words in the devise, "all my real estate," indicate a general intention to dispose of the entire estate, that must control the restraining words of the description therein.

Conceding the general intention manifested in these expressions alone, and that it is entitled to weight in determining what may have been intended by particular devises, where the latter may admit of enlarged or limited constructions, yet it is clear that no such general intention of complete disposition can control a particular direction to the contrary, or enlarge dispositions beyond their legitimate meaning. *Given* v. *Hilton,* 95 U. S. 591, 594, 24 L. ed. 458, 459.

It is evident that the testator did not write the will himself and that it is the production of an unlearned person.

Grant that the writer contemplated the disposition of all of the real estate and used those general words. But whether those words expressed the original intention of the testator or not, at some moment before he executed the will, the particular words of description, namely, "in square 594, sublot 32," were interlined so as to follow immediately after the words "all of my real estate."

There is no principle of interpretation that permits the rejec-

tion of a word or a clause in a will if by any reasonable construction the same can be given effect.

Had the interlined words been "in square 594," merely, they would have applied to lot 8 as well as to lot or sublot 32; but the testator, who knew that he owned the two separate lots, authorized or required the addition of the further words, "sublot 32," thereby excluding lot 8 from the devise.

There is nothing unreasonable in giving effect to these words, and they cannot be rejected.   Interlined so as to connect immediately with the general words before used, they form part of the description of the thing devised.   When so used, words of specific description must be given effect to limit the devise.   See *Evens* v. *Griscom,* 42 N. J. L. 579, 36 Am. Rep. 542, where the authorities are reviewed at great length; also *Peebles* v. *Graham,* 128 N. C. 218, 221, 39 S. E. 24.

The clause in the will under consideration does not present the case of an adequate and complete description of that which it was meant to pass with certainty, followed by a subsequent erroneous addition, in which the maxim, *Falsa demonstratio non nocet,* applies.   Nor is it the case of a latent ambiguity arising out of a misdescription through mistake of the testator as in cases relied on by the appellant.   See *Patch* v. *White,* 117 U. S. 210, 29 L. ed. 860, 6 Sup. Ct. Rep. 617, 710; *Priest* v. *Lackey,* 140 Ind. 399, 39 N. E. 54, and others cited on appellant's brief.

Construing the devise and direction to sell for division as limited by its express terms to sublot 32 in square 594, the words of the final clause, namely, "I also direct that my real estate be not sold for one year after my death," are fully satisfied by their application thereto.

Whether it is meant by the final clause that the proceeds of the real estate for the year withheld from sale shall go to the erection of a monument, or whether the latter is to be supplied from the proceeds of sale before division among the three lodges or orders named in the preceding clause, is a question that is not involved in this case, and will not, therefore, be considered.

We find no error in the judgment, and it will be affirmed with costs.   It is so ordered.                    *Affirmed.*